### 45440.   ALLSTATE INSURANCE COMPANY
### v. BENTLEY, Commissioner.

740

Argued July 6, 1970—Decided October 7, 1970—
Rehearing denied November 5, 1970—

*Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Devereaux F. McClatchey, Donald L. Shafer, Terry W. Cox,* for appellant.

*Arthur K. Bolton, Attorney General, Harold N. Hill, Jr., Executive Assistant Attorney General, Robert J. Castellani, Assistant Attorney General,* for appellee.

*Whelchel, Dunlap & Gignilliat, James A. Dunlap, Alston, Miller & Gaines, Francis Shackelford, F. Dean Copeland,* amicus curiae.

BELL, Chief Judge. ■ Ga. L. 1967, pp. 684-703 (*Code Ann. Ch.* 56-5), was described by the Attorney General in the oral argument before this court as "an open competition" statute. Counsel for appellant and counsel amicus curiae are in accord that this brief summation is in truth an excellent description of the statute. The General Assembly has made it clear that its intent in enacting the statute was to promote the public welfare by instituting a new procedure for the determining of insurance rates for certain types of insurance which would not only permit but encourage competition between insurers. Under this system the prior approval of the Commissioner of Insurance is no longer necessary for a premium rate to be effective. A company now may set its rate by simply filing with the Commissioner an announcement of the rate. These self-implemented rates, however, must subscribe to certain standards or they may be challenged by the Commissioner and, after a hearing before him if necessary, may be prohibited if they do not meet the statutory standards. This criterion is to be found in *Code Ann.* § 56-507 where it is succinctly stated that "(a) Rates shall not be excessive or inadequate, as herein defined, nor shall they be unfairly discriminatory." What is meant by the words "excessive" and "inadequate" is defined in the section. The third essential, the words "unfairly discriminatory" is not defined in the Act.

In reaching the decision in this case, the first holding we must make is that the three statutory criteria must each be met in order for a challenged rate to withstand a possible prohibiting order of the Commissioner. They are indivisible. A failure to comply with any one of the three in the making of a rate causes the rate to be illegal and offensive to the statute.

■ At the beginning of the hearing, following a colloquy be-

tween the Commissioner and counsel, the Commissioner correctly ruled that the burden of proof was on the insurance company to show that its new rates were not subject to the criticism charged by the Commissioner and thus not offensive to the statute.

■ The Commissioner in his order ruled that the new rates implemented by Allstate were excessive. This criterion is defined in the Code as follows: "No rate shall be held to be excessive unless (1) such rate was unreasonably high for the insurance provided and (2) a reasonable degree of competition does not exist in the area with respect to the classification to which such rate is applicable." *Code Ann.* § 56-507 (a). Allstate contends that under this definition no rate can be held to be "(1) unreasonably high for the insurance provided" unless it is first found that "(2) a reasonable degree of competition does not exist in the area." The implication of this argument is that a finding of a lack of a reasonable degree of competition standing alone would be insufficient as a basis for the Commissioner to prohibit the continued use of the rate. We cannot agree that these definitions are so interrelated that either is a condition precedent for the other or that they are interdependent. Either of these definitions supported by substantial evidence in the record may uphold a prohibition against the continued use of a rate. The Commissioner correctly ruled that it is not necessary to first find that a reasonable degree of competition does not exist before a rate may be considered to be excessive because it is unreasonably high for the insurance provided.

■ The Commissioner concluded as a matter of law that the new rates of Allstate are excessive because they are unreasonably high for the insurance provided. The Commissioner found as a fact that Allstate's homeowner's forms or policies are approximately the same as the bureaus'. He also found that some 109 companies have on file in his office variations of forms and rates for homeowner's insurance. There are some 36 companies which vary in degree from the forms alone as recommended by the rating bureaus. There is evidence showing that Allstate, although varying in degree in some of its forms from those of the bureau, in the main uses those which are comparable. Testimony by one official of the Department of Insurance, the Deputy Rating Insurance Commissioner, was to the effect that in those forms where

Allstate deviates "they may contain some additional [coverage] not included in the [bureau] forms." Thus the inference is that Allstate's deviating forms often provide a broader coverage than do those of the bureau. There is no evidence at all intimating that the coverage offered by Allstate is different to an extent that their policies are worth less than those of any other company. Importantly, it is undisputed in the record that in the cities of Atlanta, Savannah, Albany, Athens, Augusta, Columbus, LaGrange, Macon, Rome, Gainesville, Griffin, Baldwin, Dawsonville, Homer and Maysville, the homeowner's policies of Allstate comparable to those of the Multi-Line Insurance Rating Bureau, sold for less than those of the bureau. It should be noted here that the three bureaus pool their experience and establish a single rate; obviously, they do this on policy forms also. (See Division 5 (a), infra). Neither the record when viewed as a whole, nor the findings of fact made by the Commissioner, authorized the conclusion of law that the new rates of Allstate were excessive because they were unreasonably high for the insurance provided. The Commissioner's findings of fact and the record as a whole demand a finding to the contrary. The Commissioner erred in holding Allstate's rates excessive for this reason.

■ The Commissioner found as a matter of law under *Code Ann.* § 56-507 (a) that the new rates of Allstate were excessive because "(2) a reasonable degree of competition does not exist in the area with respect to the classification to which such rate is applicable."

■ It is interesting to note that in his preliminary statement after he had called the hearing to order, the Commissioner made the following comment: "The record of Allstate has been one of an intensive competitive, intensively competing company in this State. It has had rather tight and rigid practices in some areas that we will talk about on other occasions but the record of Allstate has been one of a vigorously competing company. And the purpose of this hearing this morning is to attempt to lay the record clear and insist that Allstate continue to do what it has been advertising that it is doing, compete for business." This admission by the Commissioner is sufficient to refute his conclusion of law that there is not a reasonable degree of competition in the area of homeowner's insurance. Certainly he takes administra-

tive notice that this particular company, "a vigorously competing company," is an "intensively competing company in this State." This being so, obviously it is incongruous to say in a hearing where its rates alone are questioned, that its rates are excessive because there is not a reasonable degree of competition existing in the industry.

Apparently, in considering this sub issue, the investigating authority lost sight of the main controversy under investigation, i.e., the efficacy of Allstate's new rates. The issue is not the rates of other companies nor whether other companies are competing.[1] For the decision in this case, Allstate's conduct in the area of competition is the determining factor. A monopolistic collusion has not been suggested.

The three rating bureaus are allowed to combine their experience and establish a single rate that is available to all. They do this. Thus no one member of any rating bureau is using rates produced singly by the bureau to which it belongs, but like Allstate, is using as a basis for its rates, the combined experience of all. The members of a bureau are permitted to follow the rate established by their bureau or may deviate from that rate. This permissive deviation is a principal factor in encouraging competition. The statute imposes no limitations on the sources of experience to which consideration may be given in rate making. Rather the statute provides the broadest possible scope for deliberative thought by expressly stating that "Consideration shall be given . . . to past and prospective loss experience within and outside this State." *Code Ann.* § 56-507 (b). That language means the experiences of no one company, but the combined experience of the en-

---

[1]Obviously, by not disputing the increases in rates of some 191 companies adopting essentially the same percentage of rate increases for homeowner's insurance as promulgated by the rating bureaus, he has extended his tacit approval to them. (See the Commissioner's finding of fact #5). This tacit approval necessarily includes tacit acknowledgment that these companies are not violating the law. It is an anomaly to suggest that they are not competing, which is violative of the law, and yet approve their rates without contest.

tire industry. Allstate, like all other licensed companies, is included in the broad permissiveness of the statutory language in its rate-making determination. It therefore makes no difference what process or method it follows in reaching its rate structure unless it violates the law in the particulars provided in the statute. It must be treated as others are treated. It is not, therefore, ipso facto a violation of law for Allstate to maintain its rates at a level 15 percent below those of the combined experience of the three rating bureaus.

■ To authorize the Commissioner's conclusion of law that Allstate's rates were excessive because a reasonable degree of competition does not exist in the area with respect to the classification to which the rates are applicable, the evidence must substantially support the principle that Allstate was not reasonably competitive with the other companies collectively.

The undisputed evidence shows that for the year 1965 the bureau formula for rate making was as follows: $60.00 for policy claims and settlement losses; $34.00 for expenses; and profit, $6.00. The formula used by Allstate in preparing its rates was: $53.42 for policy claims and settlement costs; $23.82 for expenses; and $9.06 profit. These figures show a cost to the bureau's insured of $100 on the bureau formula as compared to only $86.30 cost to Allstate's insured. In addition these figures show a differential in Allstate's favor of $7.12 savings in expenses and a savings of $6.58 in policy claims and settlement costs. Thus, while spending less for expenses and paying less for claims and settlement costs, Allstate yet managed to earn a third more profit while saving its policyholders 13.67 percent savings over those of companies following the bureau rates. The figures for the years 1964, 1966, 1967 and 1968, while varying somewhat in the respective amounts from those of 1965, all demonstrate a favorable position for Allstate in each category. Certainly, these factors reflect credibly on the competitiveness of Allstate.

Other convincing proof of the competitiveness of Allstate are the Commissioner's findings of fact, all supported by substantial evidence in the record, that "(7) Allstate does not operate through the independent agency system. (8) Allstate's experience in homeowner's insurance has been consistently better than the in-

dustry total for a least the past nine years producing a profit of at least 6.5 percent every year for the last nine years. (9) Allstate writes approximately 5 percent of the homeowner's insurance in Georgia . . . (13) Allstate's earned premium volume for homeowner's insurance for the years 1964 through 1968 was $5,923,784 in the State of Georgia. The 1968 earned premium volume was $1,780,622. Underwriting gain was $463,442 for the five-year period 1964 through 1968. (14) Allstate's number of policies in force increased from 15,063 in 1964 to 34,820 in 1968. Premium volume increased from $849,528 in 1964 to $2,054,823 in 1968 rising from the 6th largest writer in 1964 to the second largest writer in 1968. . . (17) Allstate maintains lists of marketing territories which require inspections before accepting a risk in such territory. A risk must meet certain underwriting standards to be acceptable."

The evidence did not authorize the Commissioner's conclusion of law that Allstate was not reasonably competitive.

■ The Commissioner erred in concluding as a matter of law that the new rates of Allstate were discriminatory to its own policyholders. The record here demonstrates conclusively that Allstate policies, comparable to those of other companies, have premium rates substantially less than those of the others and will remain less under its newly increased rate structure. The existence of these facts alone precludes the legal conclusion of discriminatory action by Allstate against its own policyholders.

■ ■ The Commissioner erred in holding as a matter of law that the new rates of Allstate must be based on its own experiences and cannot follow the experiences of the rating bureaus. To place Allstate in this category would be to seriously threaten and illegally restrain its competitive position. This result would negate the intent of the rating statute which has for its purpose the permitting and encouraging of competition among insurers in order to promote the public welfare. (See Division 5 (hb) of this opinion for other discussion bearing on this issue).

■ Throughout this record there is the suggestion of official preoccupation with the idea that profits of writers of homeowner's insurance are subject to regulation. While in older rate-making procedures, the reasonableness of profits was a major determining

factor, that is no longer the case. The new rate statute is not concerned with profits and does not authorize the regulation of profits. In fact the statute seems to recognize that the producing of good profits is a major force in engendering the desired competitive spirit in the insurance business. Certainly, under the new statute large profits earned under a rate are not ipso facto a legal basis for prohibiting the continued use of that rate. While profits may be an element to be considered in the determining of other ultimate prohibiting factors, profit alone does not taint a rate. (This is not to be confused with a lack of profit resulting in loss which might endanger the solvency of an insurer or tend to destroy competition.)

■ The Commissioner in his order directed Allstate "to make refunds of the excessive premiums charged to all policyholders with 7 percent interest per annum from the date of implementation of the offensive rates. . .h" The date Allstate implemented the rate was June 16, 1969. The date of the Commissioner's order to make refunds was November 21, 1969. The effective date of the prohibited use of the offensive rates was December 10, 1969. Thus the Commissioner sought to apply his decision retroactively. In this he erred. The limit of his authority where he finds a rate to be violative of the statute is to direct that the rate shall thereafter be prohibited. *Code Ann.* § 56-530 (a). If the illegal rate is continued in use after his valid and final order, he has the means of enforcing his order by the revocation or suspension of the offender's license to do insurance business in the State. *Code Ann.* § 56-530 (c)(d). And see *Code Ann.* § 56-536 for other authorized enforcement possibilities.

■ On judicial review of cases arising under the 1967 rating statute "The findings of the Commissioner as to any fact, if supported by substantial evidence upon consideration of the record as a whole, shall be conclusive." *Code Ann.* § 56-227 (1)(c). The statute directs that a reviewing court, in addition to deciding relevant questions of law, shall set aside findings and conclusions, unsupported by substantial evidence upon consideration of the record as a whole, and in making the foregoing determinations the court shall review the whole record. *Code Ann.* § 56-227 (3b) (v, vi). This presents a broader scope for judicial inquiry on review

than in most appeals from fact-finding bodies (e.g. those from the State Board of Workmen's Compensation) where *any* evidence supporting a finding of fact is sufficient to require the courts to honor it as conclusive and irrefutable. Here *substantial* evidence is required to support a fact found before it is conclusive on reviewing courts. This broader scope of judicial review does not mean that the courts will superimpose their views of the facts over those of the fact finder. It does mean that facts arbitrarily, capriciously, or indifferently drawn without substantial evidence supporting them in the record as a whole are not binding on reviewing courts.

A reviewing court's decision, therefore, must be based on the record as a whole and not simply on those parts of it regarded as favorable to the Commissioner's conclusion. It is thus the court's duty, when reviewing proceedings held before the Commissioner of Insurance, to consider evidence in the record that is favorable as well as that which is unfavorable to the Commissioner's decision and then determine whether the decision is, in light of the whole record, supported by substantial evidence, and if it is not, it should be reversed.

There is not substantial evidence in the record to support the Commissioner's findings of facts numbered 4, 12 and 16. Numbered findings of facts 7 and 11 are supported only partially by the evidence. However, it is not necessary in reaching the several holdings of this case to disregard any part of these questionable findings of facts for even by according efficacy to them all, and by adding to them cumulatively from the record as a whole, they do not, nor does the record as a whole, justify the erroneous conclusions of the law reached by the Commissioner, affirmed by the superior court, and here reversed.

*The judgment of the superior court is reversed with direction to enter such orders as may be necessary to assure compliance with the holdings and judgment of this court. Quillian and Whitman, JJ., concur.*